**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**Holding a Criminal Term**
**Grand Jury Sworn in on May 3, 2018**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CRIMINAL NO.** |
| **v.** | **Grand Jury Original** |
| **MUN CHOL MYONG,** | **VIOLATIONS:** |
| | **18 U.S.C. § 1956**<br>**(Money Laundering)** |
| | **FORFEITURE:** |
| **and** | **18 U.S.C. § 982(a)** |
| | **UNDER SEAL** |
| **Defendant.** | |

## INDICTMENT

The Grand Jury charges that:

At times material to this Indictment:

### BACKGROUND

1.      The charges alleged in this Indictment arise from a multi-year scheme to covertly access the U.S. financial system in spite of banking controls against the Democratic People's Republic of Korea ("DPRK" or North Korea), which are intended to protect U.S. national security by preventing money laundering and proliferation financing.  Specifically, the scheme involved a web of front companies processing transactions through U.S. correspondent accounts on behalf of North Korean entities that were otherwise barred from the U.S. financial system.

2.      The conduct alleged in this Indictment began outside of the jurisdiction of any

1

particular State or district, and later occurred within the District of Columbia and elsewhere, and is therefore within the venue of the United States District Court for the District of Columbia, as provided by Title 18, United States Code, Sections 3237(a) and 3238.

    **I.**     **United Nations Sanctions Regime**

3.      In June 2009, the United Nations Security Council expanded an existing arms embargo against North Korea to include military equipment and related materials, as well as financial transactions related to the provision, manufacture, maintenance or use of this equipment.

4.      In March 2016, the Security Council sanctioned the North Korean government, including the Reconnaissance General Bureau, its premier intelligence organization, for violating the embargo.  The Reconnaissance General Bureau trades in conventional arms and controls a North Korean conventional arms firm.  Also in March 2016, the United Nations Security Council sanctioned Office 39 of the North Korean government.

5.      In October 2016, United Nations Security Council Resolution 1718 stated that all "Member States shall prevent the direct or indirect supply, sale or transfer to the DPRK, through their territories or by their nationals, or using their flag vessels or aircraft, and whether or not originating in their territories, of: Luxury goods."

6.      In February 2017, the United Nations Panel of Experts Report determined that Glocom, a Malaysia-based company, sold radio communications equipment for equipment related to military materials.  The Panel further found that Glocom was "a front company of the Democratic People's Republic of Korea company Pan Systems Pyongyang Branch (Pan Systems Pyongyang)," which was linked to "Singaporean company named Pan Systems (S) Pte Ltd (Pan Systems Singapore)."  The Panel further reported that Pan Systems Pyongyang was operated by the Reconnaissance General Bureau.

2

7.      In the February 2017 Report, the Panel also determined that "Wonbang Trading Co." was an alias of Pan Systems Pyongyang. The Panel was investigating whether that company was actually "Wonbong Trading Co.," which was controlled by the Reconnaissance General Bureau and was a lead exporter of North Korean coal

8.      As of August 5, 2017, United Nations Security Council Resolution 2371 forbade the sale or transfer, directly or indirectly, of North Korean coal, iron, and iron ore.

9.      In the March 5 2019 Report, the Panel determined that the Korea PongHwa General Trading Company was associated with Korea Kumgang Bank, a North Korean bank.

## II.    **Bank Secrecy Act**

10.     According to the U.S. Department of the Treasury, the global financial system relies on correspondent banking relationships. A correspondent bank account is held at a U.S. financial institution with funds from a foreign financial institution. The correspondent bank account allows for the processing of deposits, payments, and other transactions on behalf of the foreign financial institution. Nearly all U.S. dollar wire transactions conducted by foreign financial institutions are processed through correspondent bank accounts held in the United States. Foreign financial institutions include not only banks, but also dealers of foreign exchange and money transmitters.

11.     The Bank Secrecy Act requires U.S. financial institutions to take anti-money laundering measures to ensure that correspondent bank accounts established by foreign financial institutions are not used to finance terrorism or to avoid sanctions programs administered by the Treasury Department's Office of Foreign Assets Control (OFAC). OFAC published a publicly available list of sanctioned individuals and companies ("Specially Designated Nationals" or "SDN") that are controlled by, or are acting on behalf of, countries targeted by U.S. economic sanctions. U.S. persons, including U.S. financial institutions, were generally prohibited from

3

engaging in transactions with or on behalf of SDNs, which effectively blocked the sanctioned entities access to the U.S. correspondent banking system. OFAC was responsible for enforcing a series of regulations relating to North Korea.

12.     The Treasury Department's Financial Crimes Enforcement Network (FinCEN) is responsible for administering the Bank Secrecy Act in furtherance of its mission to safeguard the U.S. financial system. The Bank Secrecy Act gives FinCEN a range of options, called special measures, that can be adapted to target specific money laundering and terrorist financing concerns. In June 2016, FinCEN determined that the entire North Korean financial sector was a primary money laundering concern. In November 2016, FinCEN implemented a special measure, barring all U.S. financial institutions from maintaining a correspondent bank account for any North Korean financial institution or any party acting on its behalf. The special measure also required U.S. financial institutions to take reasonable steps to not process transactions for correspondent accounts of foreign financial institutions in the United States if such transaction involved a North Korean financial institution. In effect, FinCEN barred all North Korean financial institutions and entities acting on their behalf from engaging in U.S. dollar transactions through correspondent banking in the United States. FinCEN further required U.S. financial institutions to engage in enhanced due diligence to root out any transactions by North Korean financial institutions and entities acting on their behalf. Failure to comply with the special measure entailed civil and criminal penalties for U.S. financial institutions.

## III.   Entities and Individuals

### The Defendants

13.     MUN Chol Myong was an employee of Singapore-based Sinsar Trading Pte. Ltd. ("Sinsar") and was affiliated with the Reconnaissance General Bureau. Around September 2017,

4

MUN relocated to Malaysia after Singapore expelled him due to his violations of UN Security Council Resolution 2321, which condemned North Korea's September 2016 missile tests.

14.     In its September 5, 2017 report, the Panel noted that MUN was a Singapore-based supplier to Glocom, that MUN sourced Glocom business in Singapore, and that he provided a $100,000 deposit which allowed Glocom to avoid U.S. sanctions.

15.

16.     Sinsar, a trading company located in Singapore, procured controlled U.S.-origin technology, agriculture commodities, and prohibited luxury goods like liquor and tobacco, for North Korean customers.

17.     "Sinsar Front Company 1" was a hair and beauty products company Sinsar used to make illicit U.S. dollar payments that hid any connection to Sinsar.

18.                                              Singapore-based SINSMS Pte. Ltd. (SINSMS)

19.

20.     SINSMS was a logistics and freight forwarding company based in Singapore.  In August 2018, OFAC designated China-based Dalian Sun Moon Star International Logistics Trading Co., Ltd. ("Sun Moon Star") and its Singapore-based affiliate, SINSMS.  The designation noted that these companies cooperated to facilitate illicit shipments to North Korea using falsified shipping documents, including exports of alcohol, tobacco, and cigarette-related products.  The designation further noted that employees at SINSMS also furnished information on how to evade shipping restrictions by sending cargo via SINSMS to Nampo, North Korea, through Dalian, China.

The North Korean Foreign Trade Bank

21.     On March 11, 2013, OFAC designated the Foreign Trade Bank ("FTB") of the Democratic People's Republic of Korea, as North Korea uses the FTB to facilitate transactions on behalf of actors linked to its proliferation network.

22.     On August 22, 2017, OFAC designated China- and Hong Kong-based Mingzheng International Trading Limited ("Mingzheng"). The designation noted that Mingzheng acted as a front company for FTB, and stated that it has provided financial services to FTB by, among other things, conducting U.S.–dollar denominated transactions on behalf of FTB.

23.     On September 26, 2017, OFAC designated Kim Tong Chol as a Foreign Trade Bank representative in Shenyang, China.

24.     FTB's covert branch in Shenyang, China established numerous front companies such as Mingzheng, "FTB Front Company 1," "FTB Front Company 2," "FTB Front Company 3," and "FTB Front Company 4."

Co-conspirators

25.     "Chinese Co-conspirator Company 1" was a sanctioned entity that provided freight forwarding services to North Korea.

26.     "Chinese Co-conspirator 1" was an employee of Chinese Co-conspirator Company 1.

27.     On January 2, 2015, OFAC sanctioned the Reconnaissance General Bureau of North Korea. OFAC noted that the Reconnaissance General Bureau was North Korea's primary intelligence organization and was involved in a range of activities to include conventional arms trade proscribed by numerous UNSCRs. OFAC further noted that the Reconnaissance General Bureau was responsible for collecting strategic, operational, and tactical intelligence for the

Ministry of the People's Armed Forces in North Korea.

28.     On November 18, 2010, OFAC sanctioned Korea Daesong Bank and Korea Daesong General Trading Corporation for being owned or controlled by Office 39 of the Korean Workers' Party.  OFAC noted that Office 39 was "a secretive branch of the government of the Democratic People's Republic of Korea (North Korea) that provides critical support to North Korean leadership in part through engaging in illicit economic activities and managing slush funds and generating revenues for the leadership."  The Korea Daesong Bank handles foreign currency accounts for organizations directly subordinate to Office 39, such as the Korea Kyonghung Trading Corporation, which has been exporting and importing goods to North Korea.

## COUNT ONE
### (Conspiracy to Launder Money)

29.     The allegations in paragraphs 1 through 28 of this Indictment are incorporated and re-alleged by reference herein.

30.     Beginning as early as in or about April 2013, the exact date being unknown to the Grand Jury, through in or about November 2018, within the District of Columbia and elsewhere, the defendants, MUN,                         did knowingly conspire with each other and others known and unknown to the Grand Jury to violate:

> a.  Title 18, United States Code, Section 1956(a)(2)(A), that is, by transporting, transmitting, or transferring, and attempting to transport, transmit, or transfer funds to a place in the United States from and through a place outside the United States, that is Singapore and North Korea, and from a place in the United States to and through a place outside the United States, that is China, Singapore, and North Korea, with the intent to promote the carrying on of

7

specified unlawful activity, to wit, an offense relating to a violation of section 1344 (relating to financial institution fraud); and

b. Title 18, United States Code, Section 1956(a)(2)(B), that is, by transporting, transmitting, or transferring, and attempting to transport, transmit, or transfer funds to a place in the United States from and through a place outside the United States, that is Singapore and North Korea, and from a place in the United States to and through a place outside the United States, that is China, Singapore, and North Korea, knowing that the funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity, to wit, an offense relating to a violation of section 1344 (relating to financial institution fraud).

## Objects of the Conspiracy

31.    An object of the conspiracy was for the co-conspirators to enrich themselves by obtaining unlawful access to the U.S. financial system for North Korean entities, and to obtain commodities for export to North Korea that could only be purchased in U.S. dollars.

## Manner and Means of the Conspiracy

32.    The conspirators would and did use the following manner and means, among others, to accomplish the objects of the conspiracy:

a.    Defendants MUN,                and other conspirators used e-mail accounts and to communicate with co-conspirators in English, Korean, and

8

Chinese (some of which are translated below);

b. Defendants MUN,                    and other conspirators illegally accessed the U.S. financial system, by concealing that the transactions were for the benefit of North Korean entities;

c. Defendants MUN,                    and other conspirators deceived U.S. correspondent banks into processing international U.S. dollar transactions, which the correspondent banks would have otherwise not processed;

d. Defendants MUN,                    and other co-conspirators, entered into contracts with sellers who required payments in U.S. dollars, in order to facilitate trade with North Korea;

e. Defendants MUN,         and other co-conspirators used                    Singaporean company, and Chinese Co-conspirator Company 1 to arrange for the covert transshipment of commodities to North Korean customers, for which they made payments via U.S. correspondent banks in U.S. dollars; and

f. Defendants MUN,                    and other co-conspirators, concealed their illegal access of the U.S. correspondent banking system and prevented the correspondent banks from conducting anti-money laundering due diligence by:

   i.   using front companies for North Korean banks to process payments;

   ii.  using third-party companies to make payments;

   iii. using bank accounts not in their own name;

      iv.     removing references to North Korea from wire transactions; and

      v.     listing false end destinations on shipping documents that did not reference North Korea.

## Overt Acts

33.    In furtherance of this conspiracy, and to accomplish its purposes and objects, at least one of the co-conspirators committed or caused to be committed, in the District of Columbia, and elsewhere, at least one of the following overt acts, among others:

### Concealment of North Korean Nexus to Prevent Banks from Rejecting Transactions

1) On or about October 8, 2015,      emailed MUN and copied discussing banks' sensitivity to conducting transactions involving North Korea.

2) On or about October 8, 2015     emailed MUN and copied     directing them to remove from any banking transaction "the name Nampo Port, DPR Korea, and North Korea," and that a failure to do so would lead the banks to reject the transaction and send the funds to the U.S. Treasury.

3) On or about October 8, 2015,     further stated to MUN that SINSMS would be using a new bank for U.S. dollar transactions.

4) On or about October 8, 2015, MUN responded to     "Kindly pls send me Bank Name."

5) On or about May 18, 2016,     emailed MUN     and wrote, "Attached is the invoice for the Beer. You can [wire] to me and I will write a cheque to them. The person in charge do not wish to let their counter part to

10

know where is cargo goes to."

6) On December 14, 2017.        received an email from a Thai company regarding a shipment of various items including cut rag tobacco, and which stated, "Please remove North Korea from the invoice. Please add bank details to the invoice instead."

Sinsar Loan to FTB Shortly After FTB Is Sanctioned, For Which FTB Launders Repayment

7) On or about May 10, 2015, MUN emailed Kim Tong Chol an April 25, 2013 loan agreement, which bore Sinsar's seal and the signature of        and stated that Sinsar agreed to loan $500,000.00 to FTB's covert office in Shenyang, China for the purpose of prompting trade with, and commercial investment in, North Korea, with an interest rate of 18%, and a loan period of May 1, 2013 to November 1, 2013.

8) On or about May 20, 2013, Kim Tong Chol, whose signature block said "Shenyang," sent MUN the bank account number for "KIMTONGCHOL" at the Industrial and Commercial Bank of China.

9) On or about May 20, 2013, MUN responded to Kim Tong Chol with a document entitled "Remittance Sinsar" and provided instructions for wiring U.S. dollars to Sinsar.

10) On or about July 4, 2013, Kim Tong Chol emailed MUN instructions for wiring funds, including in U.S. dollars, to FTB Front Company 1.

11) On or about October 23, 2013,          emailed MUN details of Sinsar's U.S. dollar bank account at FTB.

12) On or about the dates listed below, the co-conspirator(s) caused repayments by front companies to Sinsar, which wired through a U.S. correspondent bank, as follows:

|   | Date | Co-conspirator(s) | Caused payment of | By Front Company | To |
|---|------|-------------------|-------------------|------------------|----|
| a | May 14, 2013 | Kim Tong Chol | $27,377.37 | FTB Front Company 1 | Sinsar |
| b | May 16, 2013 | Kim Tong Chol | $131,500.00 | FTB Front Company 2 | Sinsar |
| c | May 21, 2013 | Kim Tong Chol | $100,708.55 | FTB Front Company 1 | Sinsar |
| d | Jun. 5, 2013 | Kim Tong Chol | $24,111.23 | FTB Front Company 2 | Sinsar |
| e | Jul. 9, 2013 | Kim Tong Chol | $189,875.00 | FTB Front Company 2 | Sinsar |
| f | Sept. 4, 2013 | Kim Tong Chol | $24,857.00 | Mingzheng | Sinsar |
| g | Sept. 18, 2013 | Kim Tong Chol | $24,218.97 | Mingzheng | Sinsar |
| h | Oct. 22, 2013 | Kim Tong Chol | $20,871.40 | Mingzheng | Sinsar |
| | | Total | $543,519.52 | | |

Subsequent Illicit U.S. Dollar Payments and Sinsar Loan Relating to FTB

13) On or about May 27, 2014, MUN and Kim Tong Chol caused a $38,808.00 payment by Mingzheng to Sinsar which wired through a U.S. correspondent bank.

14) On or about June 15, 2014, MUN sent Kim Tong Chol a document that stated "Remittance *in US$* to **Sinsar Trading (Pte) Ltd**," provided a bank account number in Singapore, and listed below that the bank account number for "KIMTONGCHOL" at the Industrial and Commercial Bank of China.

15) On or about August 14, 2014, MUN and Kim Tong Chol caused a $34,835.00 payment by Mingzheng to Sinsar, which wired through a U.S. correspondent bank.

16) On or about September 10, 2014, MUN sent Kim Tong Chol a bank slip showing the transfer of $112,500.00 to Singapore Company 1.

17) On or about September 11, 2014, MUN and Kim Tong Chol caused a $112,500.00 payment by Mingzheng to Singapore Company 1, which wired through a U.S. correspondent bank.

18) On or about December 8, 2014, MUN and Kim Tong Chol caused a $31,965.61 payment by Mingzheng to Sinsar, which wired through a U.S. correspondent bank.

19) On or about May 10, 2015, MUN emailed Kim Tong Chol a February 15, 2014 loan agreement, which bore Sinsar's seal and the signature of          and stated that Sinsar agreed to a second loan of $1,000,000.00 with similar conditions as the prior loan, and a term of February 20, 2014 to February 20, 2015.

20) On or about May 10, 2015, Kim Tong Chol emailed MUN asking for MUN to review the FTB loan contracts.

21) On or about May 18, 2015, MUN emailed Kim Tong Chol asking for the bank account information to which the loan should be sent.

22) On or about June 23, 2015, MUN and Kim Tong Chol caused a $49,988.00 payment by Mingzheng to Sinsar, which wired through a U.S. correspondent bank.

23) On or about July 6, 2015, Kim Tong Chol provided MUN with a bank account

number at the Industrial and Commercial Bank of China.

24) On or about September 1, 2015, MUN asked Kim Tong Chol to transfer $24,400.00 to SINSMS's U.S. dollar account

25) On or about September 8, 2015, MUN, Kim Tong Chol, caused a $4,995.00 payment by Mingzheng to SINSMS, which wired through a U.S. correspondent bank.

26) On or about September 23, 2015, MUN, Kim Tong Chol caused a $24,395.00 payment by Mingzheng to SINSMS, which wired through a U.S. correspondent bank.

27) On or about October 11, 2015, MUN provided Kim Tong Chol remittance instructions for a $99,500.00 payment to Sinsar.

28) On or about December 27, 2015, MUN sent Kim Tong Chol a payment request for "USD89,790.00" to Sinsar, and noted the "Person in Charge:

29) On or about December 29, 2015, MUN and Kim Tong Chol caused a $89,772.00 payment by Chinese Front Company 1 to Sinsar, which wired through a U.S. correspondent bank.

Use of FTB Front Companies to Conceal Purchase of Export Controlled Item

30) On or about September 3, 2014, MUN discussed with Singapore Company 2 the purchase of boat engines produced by U.S. Company 1, which were controlled for Anti-Terrorism reasons to North Korea.

31) On or about September 3, 2014, MUN received a quote and invoice from Singapore Company 2 which totaled $260,000 for the engines.

32) On or about September 4, 2014, MUN notified Singapore Company 2 that

14

MUN remitted a 50% down payment of $130,000, and marked the payment with invoice number PI0278/08/14.

33) On or about September 4, 2014, Kim Tong Chol sent MUN a bank slip showing a transfer of $130,000 from Mingzheng to Singapore Company 2, and a reference to invoice number PI0278/08/14.

34) On or about December 22, 2014, MUN received an update from Singapore Company 2 that the shipment of 10 engines, 10 sterndrives and accessories would be delivered by December 31, 2014 to Singapore.

35) On or about December 22, 2014, MUN received an invoice from Singapore Company 2 which directed MUN to wire the outstanding $130,000.00 as quickly as possible, and which invoice documented the sale as involving of SINSMS.

36) On or about December 28, 2014, MUN emailed himself telegraphic transfer instructions for wiring funds to Singapore Company 2, which instructions contained the note "USD $130,000 Invoice number PI0278/08/14."

Use of UN-identified Pan Systems to Launder Illicit U.S. Dollar Payments

37) On or about November 10, 2014, MUN requested assistance from Singapore Company 3 to arrange accommodations in Singapore for the director and an employee of Pan Systems.

38) On or about February 4, 2016,        drafted an email to a North Korean Trading Company, which directed the company to send "partial payment of

US$60,000 to the Pyongyang Branch of Singapore Pan System Pte Ltd" as payment for a prior sale by Sinsar.

39) On or about February 4, 2016, MUN directed        to send the draft request by fax to the North Korean Trading Company.

40) On or about February 18, 2016, MUN directed        to email the North Korean Trading Company with a request for "partial payment of US$99,387 to the Pyongyang Branch of Singapore Pan System Pte Ltd."

41) On or about March 2, 2016,        drafted an email to North Korean Trading Company 1 "Re : US$50,000" which confirmed Sinsar's payment receipt via "Pyongyang branch of Singapore Pan System Pte Ltd." and that Sinsar would "ship the contracted cargoes as soon as possible."

42) On or about April 7, 2016,        received an email from North Korean Trading Company 1, which indicated that it had "remitted the balance US$29,387.20 to Pyongyang Branch of Singapore Pan System Pte Ltd," and asked        to send them "the receipt of US$50,000 and US$20,000, US$29,387.20."

43) On or about April 7, 2016, MUN sent        the contract relating to North Korean Trading Company 1, which was dated February 29, 2016 and provided details of a shipment of goods from Sinsar to North Korea.

44) On or about July 21, 2016,        emailed MUN an invoice on Sinsar Front Company 1 stationery documenting the sale of goods at a cost of US$103,341.00 to "Pan System, Pyongyang Branch, Pyongyang, North Korea."

16

Use of Sinsar Front Company 1 to Deceive Banks into Processing Illicit Transactions

45) On or about April 15, 2016,        emailed MUN details of Sinsar's bank account at FTB.

46) On or about April 25, 2016, MUN informed        that Sinsar's FTB account received transfers of $30,000 to on April 20th, and $40,000 on April 23rd.

47) On or about April 27, 2016.        instructed that customers who were having difficulty making payments to Sinsar should use Sinsar's "associated company [Sinsar Front Company 1]," a Singapore-based distributor of hair care and skin care products and appliances.

48) On or about April 27, 2016,        further stated that customers should inform Sinsar "clearly details of your remittance (whether direct to Sinsar or Sinsar Front Company 1) so that we can monitor your payment correctly."

49) On or about April 27, 2016, MUN told the Korea Kyonghung Trading Corporation that SINSAR received a $30,000 and $40,000 transfer from FTB, but that the fourth transfer of funds on the on the 27th had not yet occurred.

50) On or about April 27, 2016, MUN directed the President of the Korea Kyonghung Trading Corporation to send future remittances directly to SINSAR's new account, and attached a file with Sinsar Front Company 1's U.S. dollar bank account information.

51) On or about April 28, 2016, MUN told Korea Kyonghung Trading Corporation to take the three attached remittance forms directing payment of $30,000.00, $40,000.00, and $40,000.00 to the international department of

FTB, and then confirm payment.

52) On or about April 28, 2016,       signed the first FTB remittance slip requesting the transfer of $30,000 from Sinsar's FTB account to Sinsar Front Company 1's U.S. dollar account in Singapore as a "payment for goods."

53) On or about April 28, 2016,       signed the second FTB remittance slip requesting the transfer of $40,000 from Sinsar's FTB account to Sinsar Front Company 1's U.S. dollar account in Singapore as a "payment for goods."

54) On or about April 29, 2016,       signed the third FTB remittance slip requesting the transfer of $40,000 from Sinsar's FTB account to Sinsar Front Company 1's U.S. dollar account in Singapore as a "payment for goods."

55) On or about September 9, 2016, MUN asked       to confirm receipt of $35,000 remitted on September 7th to Sinsar Front Company 1.

56) On or about September 9, 2016       replied to MUN, "We received amount US$34,905.66."

57) On or about April 18, 2017,       provided MUN with details of a new Singaporean bank account for "Remittance in US$ to [Sinsar Front Company 1]."

58) On or about May 4, 2017, MUN informed       of a $84,725.00 remittance to Sinsar Front Company 1's new Singaporean bank account.

Defendants Deceived Banks To Make Illicit U.S. Dollar Payments for the Export of Commodities to North Korea

Singapore Company 1

59) On or about October 10, 2016, MUN received Contract Number 16-85.1500

18

from Singapore Company 1, which offered the sale of goods for a total of $990,000 to North Korea.

60) On or about October 10, 2016, MUN agreed to enter into Contract Number 16-85.1500 and provided Korea Kyonghung Trading Corp as the consignee.

61) On or about the dates listed below, MUN caused payments on Contract Number 16-85.1500 by front companies to Singapore Company 1, which wired through a U.S. correspondent bank, as follows:

|   | Date | Co-conspirator | Caused payment of | By Front Company | To |
|---|------|----------------|-------------------|------------------|-----|
| a | Nov. 9, 2016 | MUN | $79,486.00 | FTB Front Company 2 | Singapore Company 1 |
| b | Nov. 14, 2016 | MUN | $50,817.70 | FTB Front Company 2 | Singapore Company 1 |
| c | Nov. 29, 2016 | MUN | $163,681.70 | FTB Front Company 3 | Singapore Company 1 |
| d | Dec. 2, 2016 | MUN | $107,118.70 | FTB Front Company 2 | Singapore Company 1 |
| e | Jan. 9, 2017 | MUN | $165,686.00 | FTB Front Company 3 | Singapore Company 1 |

62) On May 8, 2017, MUN and Chinese Co-conspirator 1 received an email from Singapore Company 1 stating that they would have to switch the bill of ladings in Dalian, China, because they "cannot have any [North] Korean details on the 1st leg bl."

63) On or about May 9, 2017, Chinese Co-conspirator 1 emailed MUN and Singapore Company 1 and acknowledged the instructions to switch the bill of ladings.

64) On or about May 18, 2017,                    and MUN caused Singapore Company 3 to make a $62,500.00 payment on invoice number 17/251EX to

Singapore Company 1.

65) On or about May 18, 2017,        received invoice number 17/251EX from Singapore Company 1, which documented the sale of goods to Korea Kyonghung Trading Corporation, Pyongyang, North Korea.

66) On June 8, 2017, MUN received an email from Singapore Company 1 stating that they would switch shipping services from Chinese Co-conspirator 1 to        and t**o "not mention [Singapore Company 1] in any of the documentations."**

67) On or about June 8, 2017, MUN emailed        regarding the shipment and wrote, "Noted with thanks. Kindly pls remember 2 consignee in making 2nd BL at Dalian. Korea Chukjon Trading Corp for 4 container. Korea Wonbong Trading Corp for 6 container."

68) On or about June 16, 2017, MUN sent        a bill of lading which reflected that Sun Moon Star was shipping the goods to Korea Chukjon Trading Corp and Korea Wonbong Trading Corp. from Dalian, China to Nampo, North Korea.

69) On or about June 21, 2017,        responded to MUN, "Please find attach 2nd Leg BL draft with vessel detail and BL number. Eta Dalian 24 June, Etd Dalian 25 June, Eta Nampo 26 June."

Singapore Company 3

70) On or about June 15, 2014, MUN directed Kim Tong Chol to send money to the U.S. dollar bank account of Singapore Company 3.

71) On or about November 23, 2014, MUN received from Singapore Company 3

20

a contract for 2,178 cartons of beer at a cost of $6.50 per carton, to Nampo, North Korea.

72) On or about September 28, 2015, MUN provided Kim Tong Chol a bank transfer slip showing the transfer of $69,500.00 to Singapore Company 3.

73) On or about December 27, 2015, MUN emailed Kim Tong Chol a bank transfer slip showing the transfer of $80,000.00 to Singapore Company 3.

74) On or about May 23, 2016                        caused a $32,000.00 payment by Singapore Company 3 to SINSMS, which wired through a U.S. correspondent bank.

Singapore Company 4

75) On or about September 13, 2016, MUN received an inquiry from Singapore Company 4 asking whether a payment by FTB Front Company 2 to Singapore Company 4 should be considered as payment from MUN for the prior purchase of liquor.

76) On or about September 13, 2016, MUN responded to Singapore 4, "Yes. Right. I just called my customer and confirmed."

77) On or about September 15, 2016, MUN received an invoice from Singapore Company 4 for the sale of 604 cases of assorted liquor (including Remy Martin, Chivas Regal, and Johnnie Walker Black and Gold) to Dalian Sun Moon Star with an amount due of $103,186.

78) On or about October 16, 2016, MUN received an invoice from Singapore Company 4 for the sale of 571 cases of assorted liquor to Dalian Sun Moon Star with an amount due of $96,270.00.

21

79) On or about November 27, 2016,          emailed MUN, "Dear Mr. Mun Attcahed [sic] is the 2nd sector BL for your action from Dalian to Nampo. Thanks,          "

80) On or about November 27, 2016,          attached to this email to MUN a bill of lading showing the 571 cases of assorted liquor were shipped by Sun Moon Star to Korea Kyonghung Trading Corp with a port of discharge at Nampo, North Korea.

81) On or about May 23, 2017,          emailed MUN and copied          regarding a shipment of products related to Singapore Company 4 and stated that MUN should let her know if MUN was "adding any 'extra' cargo in this container."

82) On or about June 16, 2017, MUN received an email from Singapore Company 4 that the payment of $69,005.00 was not from MUN's North Korean customer.

83) On or about June 19, 2017, MUN confirmed to Singapore Company 4 that this payment was not from MUN's North Korean customer.

84) On or about June 23, 2017, MUN received an email from Singapore Company 4 requesting payment of $9,205.97.

85) On or about June 23, 2017, MUN responded that Singapore Company 3 would pay $9,206 to Singapore Company 4.

Singapore Company 5

86) On or about April 9, 2015, Chinese Co-conspirator Company 1 received an email from Singapore Company 5 discussing the need to remove the North Korean details from the consignee name.

22

87) On or about May 5, 2017, MUN received contract number YM1705004Z for the sale of goods to Korea Kyonghung Trading Corporation from Singapore Company 5's front company.

88) On or about May 19, 2017, Singapore Company 5's front company issued an invoice of $215,987.50 for contract number YM1705004Z to FTB Front Company 4, which falsely stated that the shipment was destined for Dalian, China.

Additional Transactions

89) On or about July 25, 2013,           sent MUN an invitation letter for representatives of Korea Ponghwa Trading company from North Korea to come meet Sinsar in Singapore "to discuss details of [their] interest in importing various products from us."

90) On or about January 11, 2018, MUN drafted an email entitled "Russia," with attachments discussing the establishment of the Korea Ferrous Metals Exporting and Importing Corporation's representative office, located in Vladivostok, Russia, whose primary directive was to develop business with their Russian partners in the minerals industry.

91) On or about January 11, 2018, MUN drafted a email with a second attachment that noted the appointment of a representative of Korea Ferrous Metals Exporting and Importing Corporation, whose responsibilities would include developing business in third countries, managing the company's property and assets, and establishing its bank accounts, and managing its finances.

92) On or about January 29, 2018,           :mailed MUN and copied           an

account statement which detailed the dates, invoice numbers, and amount due for SINSMS services rendered to MUN from June 2017 to January 2018.

93) On or about January 29, 2018,          emailed MUN and copied          and said that SINSMS preferred wire transfers over cash payments, and provided SINSMS's U.S. dollar bank account number.

94) On or about February 5, 2018, MUN sent a customer in North Korea a bill of lading referencing a shipment from a Malaysian company to Dalian Sun Moon Star in China, via a Vietnamese forwarding agent, and an invoice from SINSAR for the sale of 400 cartons of whisky and wine with a final destination of Nampo, North Korea for $86,000.00.

95) On or about February 27, 2018,               caused a $15,610.00 payment by the Vietnamese forwarding agent to SINSMS, which wired through a U.S. correspondent bank.

96) On or about November 2, 2018,          emailed a customer regarding freight charges of $9,900.00 related to an attached bill of lading showing the shipment of "equipment and materials" from Dalian, China to Nampo, North Korea.

(**Conspiracy to Launder Monetary Instruments** in violation of Title 18, United States Code, Section 1956(h)).

### COUNTS TWO-SIX
### MONEY LAUNDERING

34. The allegations in Paragraphs 1 through 28 and 32 through 33 of this Indictment are incorporated and re-alleged by reference here.

35. On or about the dates listed below, within the District of Columbia and elsewhere,

24

the defendants named below did knowingly transport, transmit, or transfer, and attempt to transport, transmit, or transfer funds to a place in the United States from and through a place outside the United States, that is China, Singapore, and North Korea, and from a place in the United States to and through a place outside the United States, that is China, Singapore, and North Korea, in the amounts described below with the intent to promote the carrying on of specified unlawful activity, to wit, an offense relating to a violation of section 1344 (relating to financial institution fraud)

| COUNT | DEFENDANT | DATE | TRANSMISSION OF FUNDSS |
|-------|-----------|------|------------------------|
| 2 | MUN and | On or about September 4, 2014 | $130,000 from Mingzheng to Singapore Company 2 |
| 3 | MUN, | On or about September 23, 2015 | $24,395.00 payment by Mingzheng to SINSMS. |
| 4 | MUN and | On or about December 29, 2015 | $89,772.00 payment by Chinese Front Company 1 to Sinsar. |
| 5 | | On or about May 23, 2016 | $32,000.00 payment by Singapore Company 3 to SINSMS |
| 6 | MUN and | On or about January 9, 2017 | $165,686.00 payment by FTB Front Company 3 to Singapore Company 1 |

(**Laundering of Monetary Instruments**, in violation of Title 18, United States Code, Section 1956(a)(2)(A))

## FORFEITURE ALLEGATION

1.      Upon conviction of the offense alleged in Counts One through Six of this Indictment, the defendants shall forfeit to the United States any property, real or personal, involved in this offense, or any property traceable to such property pursuant to 18 U.S.C. § 982(a)(1). The United States will also seek a forfeiture money judgment for a sum of money equal to the value of any property, real or personal, involved in this offense, and any property traceable to such property.

2.      If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants:

            a.      cannot be located upon the exercise of due diligence;

            b.      has been transferred or sold to, or deposited with, a third party;

            c.      has been placed beyond the jurisdiction of the Court;

            d.      has been substantially diminished in value; or

            e.      has been commingled with other property that cannot be divided without difficulty;

the defendants shall forfeit to the United States any other property of the defendants, up to the value of the property described above, pursuant to Title 21, United States Code, Section 853(p).

(**Criminal Forfeiture,** pursuant to 18 U.S.C. § 982(a)(1) and (2), and 21 U.S.C. § Section 853(p)).

A TRUE BILL

FOREPERSON

Attorney of the United States in
and for the District of Columbia

26