**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA       :

           v.              :       **19-CR-147 (RC)**

MUN CHOL MYONG       :

### DEFENDANT'S SENTENCING MEMORANDUM REQUESTING A SENTENCE OF TIME SERVED

Mr. Mun respectfully requests that the Court impose a sentence of time served (the equivalent of four years). We ask the Court not to impose a term of supervised release as Mr. Myong's deportation is certain. Although such a sentence would be a variance from the recommended guideline range, it is a sentence that is sufficient but not greater than necessary given the unique circumstances of this case, Mr. Mun's personal history and characteristics which include his age, his wife battling cancer in China, the length of his pretrial detention (nearly 4 years), and his lack of any prior criminal record. Recognizing these unique facts, Mr. Mun requests that the Court impose a sentence of time-served which is consistent with the recommendation of the the United States Probation Office.

### Factual Background

Mr. Mun is a 57 year old citizen of North Korea who was paroled into the United States after having been arrested and incarcerated in Malaysia. Mr. Mun was charged with conspiring to violate the laws of the United States including the laws against money laundering (violation of 18 U.S.C. §1956). The alleged criminal conduct spanned from April 2013 to November 2018, and Mr. Mun was arrested in Malaysia where he was detained for nearly two years awaiting

extradition to the United States. He has continued to be detained since his arrival in the United States.

On September 6, 2022, on the advice of counsel and over the objection of the United States, Mr. Mun requested this Court's permission to enter a plea pursuant to *North Carolina v. Alford*, 400 U.S. 25 (1970). At the time of the plea, the government asserted that Mr. Mun along with his colleagues purchased luxury goods destined for North Korea and otherwise acted in a manner to benefit North Korea in violation of sanctions placed on North Korea by the United States. The government further proffered that Mr. Mun and others defrauded the United States Banks by using front companies and third party payments to deceive financial institutions in the United States into processing the illegal transactions.

United States Presidents have issued Executive Orders pursuant to International Emergency Economic Powers Act to reduce the proliferation of weapons and usable fissile material into North Korea. Those Executive Orders have prohibited not just the sale of weapons and dual-purpose materials, but any transactions with various countries, including North Korea. The U.N. Security Council has adopted resolutions prohibiting member states from selling or supplying weapons to North Korea or providing any items or technology that could contribute to North Korea's nuclear weapons program. Under those resolutions, the sale of any goods to North Korea was also prohibited. Thus, while the primary purpose is to prevent the importation of materials to North Korea that would harm the national interest of the United States, the prohibition applies also to alcohol, sugar, and tobacco -- goods Mr. Mun is alleged to have imported through the trading companies for whom he worked. For this, Mr. Mun was charged with money laundering as he failed to disclose the use of a front company to execute payments

and for failure to disclose that the products were destined for North Korea. While others were charged in the same and related indictments, only Mr. Mun was arrested and paroled into the United States to face federal charges.

Since his presentment in this district, Mr. Mun has been detained at a local D.C. Department of Corrections facility**.** His detention has been extremely difficult for him and for his family members who are on the other side of the world. Mr. Mun does not speak the language, and he has had few opportunities for meaningful interactions with others for nearly two years. Incarceration in the District of Columbia has been akin to solitary confinement – he interacts with no one and spends his time worrying about this wife's cancer and the burden that his incarceration has had on his family. His arrest also has been emotionally and financially difficult for his two daughters. His wife, who was diagnosed with breast cancer, is now facing cervical cancer and to Mr. Mun's knowledge is simply not receiving medical treatment. Mr. Mun, who spent years caring for his wife when she was first diagnosed with cancer, is guilt ridden that he has not been able to care for and support her.

## <u>Argument</u>

When imposing a sentence, the Court must consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for [the applicable offense and the applicable category of defendant as set forth in the Sentencing Guidelines];

(5) any pertinent policy statement [issued by the Sentencing Commission];

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

*See* 18 U.S.C. § 3553(a); *United States v. Booker*, 543 U.S. 220, 259 (2005).

Congress has further provided that:

[t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.

*See* 18 U.S.C. § 3582 (emphasis added). With that limitation and considering all of the purposes of sentencing, the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with the purposes [of sentencing]."   18 U.S.C. § 3553(a) (emphasis added).

**(1)     The United States Sentencing Guidelines.**

The Probation Office has calculated the sentencing range under the United States Sentencing Guidelines to be 121 to 151 months. The base offense level for money laundering is

8 plus the number of offense levels from the fraud table, §2B1.1, which is this case is 14 levels. The Probation Office then assesses an additional 2 level increase for money laundering and an additional 2 level increase for sophisticated means, and a 6-level increase because the funds were the proceeds of an offense "involving national security." While Mr. Mun does not object to the base offense level or the applicability of the enhancements, he asserts that a three-level reduction for acceptance of responsibility would be appropriate. By electing to move forward with an *Alford* plea, Mr. Mun is no different than those defendants who plead guilty and save the Court and the government the time and expense of a lengthy and complicated trial. Furthermore, he has agreed not to appeal the sentence of this Court and to a stipulated order of removal – two provisions that drive most similar plea agreements. Finally, both Probation and Mr. Mun agree that a variance from the guidelines range is appropriate and a sentence of time-served is sufficient and not greater than necessary in this case.

Ultimately, every sentence must be guided by § 3553(a)'s parsimony clause, which directs sentencing courts to "impose a sentence sufficient, but not greater than necessary, to comply with the factors set out in 18 U.S.C. § 3553(a)(2)," namely, "proportionality, deterrence, incapacitation, and rehabilitation." *Douglas*, 713 F.3d at 700; *see also United States v. Ministro-Tapia*, 470 F.3d 137, 141–142 (2d Cir. 2006). Once the Court correctly calculates the advisory guidelines range, the Court must then "make an individualized assessment," considering the remaining factors set forth in § 3553(a). *Gall*, 552 U.S. at 50. Because the Guidelines merely reflect a "wholesale" view "rough[ly] approximat[ing] . . . sentences that might achieve § 3553(a)'s objectives," *Booker* and § 3553(a) require the Court to tailor an individualized sentence that actually does achieve § 3553(a)'s objectives in the case before it. *Rita v. United*

*States*, 551 U.S. 338, 348, 350 (2007). Consequently, this Court must "filter the Guidelines' general advice through § 3553(a)'s list of factors." *Id*. at 358; *see also Gall*, 552 U.S. at 52 ("'It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996))).

In this case, while Mr. Mun did not plead guilty and instead entered an Alford plea upon the advice of counsel, granting him the three points for acceptance of responsibility (or its equivalent via a downward variance), is appropriate because Mr. Mun saved the government and court the time and expense of a lengthy trial. In fact, Mr. Mun did more. He waived his right to have the government review and produce discovery pursuant to the Classified Information Procedures Act ("CIPA"). That waiver alone saved the government and other national security agencies hundreds of hours in a SCIF. And, Mr. Mun waived his right to appeal the sentence imposed by this Court. Finally, he agreed to not have Immigration and Customs Enforcement expend time and money deporting him; he agreed to a stipulated order of removal from the United States. These are all concessions that would have been sought in a plea agreement. Thus, short of a three-level variance that would reflect the time and resources saved, Mr. Mun would be unfairly punished for maintaining his innocence.

Moreover, recognizing that the six level increase has been applied under USSG §2S1.1(b)(1)(B)(iii), a six level downward variance is appropriate because this is not a typical case involving national security interests. Further, a significant variance is proper to recognize the substantial likelihood that he will remain in custody for some time while arrangements are

made to remove him from the United States after he was brought here not of his own free will. His removal will likely be significantly delayed since no one has ever been removed to North Korea before so there is no history or template to rely upon. He has no travel papers allowing for a departure from the United States and, because the United States has no relationship with his home country, no way of obtaining assistance from North Korea to obtain those papers.

When considering the advisory guidelines in this case, the Court can analogize this case to cases filed under IEEPA, which are governed by U.S.S.G. § 2M5.1. Section 2M5.1 provides for a base offense level of 14 for some evasions of export controls, but provides for a higher base offense level when the expert controls constitute "national security controls" and when "the offense involved a financial transaction with a country supporting international terrorism." There are a line of cases holding that the higher level applies because IEEPA constitutes national security controls. *See United States v. McKeeve*, 131 F.3d 1, 14 (1st Cir. 1997) (exportation of goods in violation of Libyan embargo constituted violation of national security controls even if specific goods did not implicate national security interests)).

Similarly, the six level increase under USSG § 2S1.1(b)((1)(B)(iii) applies if Mr. Mun knew the laundered funds were the proceeds of an embargo violation. *See United States v. Hanna*, 661 F.3d 271, 293-94 (6th Cir. 2011) (six-level enhancement applied simply because defendant knew that the materials were headed to an embargoed country but variance granted in part due to nature of items). Nevertheless, while the six level increase may apply, because Mr. Mun's conduct did not in fact involve the transfer of goods that directly implicate national security interests, such as weapons or classified or sensitive information or even dual-purpose materials, a downward variance is appropriate. The conduct at issue here was laundering money

7

to hide the importation of luxury goods like alcohol and tobacco which had no military purpose whatsoever. Thus, while the 6 level increase technically applies, a variance downward is appropriate to reflect the actual potential harm to national security. More lengthy sentences should be reserved for cases where actual national security implications are present. *See*, *e.g.*, *United States v. Cheng*, 392 F. Supp. 3d 141; 148 (D. Mass. 2019) (departing upward to impose sentence of nine years because defendant shipped highly sensitive goods with nuclear applications to Iran and scheme involved substantial volume of commerce, numerous occurrences, and a serious threat to national security); *United States v. Vasquez*, 745 Fed. Appx. 321, 322-23 (11th Cir. 2018) (defendant who entered guilty plea to participating in weapons smuggling scheme sentenced to 46 months); *United States v. Kuyumcu*, No. 16-cr-308 (DLI), 2017 WL 3995576 (E.D.N.Y. Sept. 8, 2017) (defendant who shipped Colbalt Powder with potential military and nuclear applications to Iran and continued to attempt to do business with Iran sentenced to 57 months); *see also McKeeve*, 131 F.3d at 14-15 (defendant who violated expert controls by selling computer equipment to Libya and obstructed justice by committing perjury when testifying at his trial sentenced to 51 months).

While there is no commentary to § 2S1.1(b)(1)(B)(iii), the Commentary to the corollary § 2M5.1 suggests that when determining an appropriate sentence, the Court should consider in part "the degree to which the violation threatened a security interest of the United States". U.S.S.G. § 2M5.1, Application Note 2. Here, there was no direct threat to U.S. security interests and no effort to send dangerous weapons or products.

**(2)**     **The Nature and Circumstances of the Offense.**

The nature of Mr. Mun's violation supports a sentence of time-served. As noted above, while the guidelines apply a six level enhancement because the violation involved national security, Mr. Mun laundered funds from the proceeds of importing alcohol, tobacco and sugar, not weapons or dual purpose items that would bring harm to the United States.

Moreover, the results of his conduct have had severe consequences on his health and that of his family. Mr. Mun was first detained in the notoriously horrible Sungai Buloh Prison in Malaysia. As detailed below, overcrowded, the prison has no beds and Mr. Mun slept on the floor. There are no cells, and the open dorms house 80 to 100 people in spaces so small that one slept almost on top of another. Medical care and treatment is non-existent and Mr. Mun suffered from dysentery as a result of the lack of clean water. According to Suhakam, (Malaysia Human Rights Commission), tuberculosis and rat urine poisoning is a common cause of death. Clogged toilets, moldy food trays, and living amongst the rats and roaches are just some of the things that inmates have to deal with. Conditions are even worse when there is a water shortage. See, https://cilisos.my/600-people-died-in-malaysian-prisons-in-the-last-2-years-but-not-because-they-were-executed/

In weighing the appropriateness of the requested sentence, the Court should take into account the exceptionally harsh conditions of confinement that Mr. Mun has suffered during his incarceration in this country as well which has resulted in the psychological and emotional equivalent of a far longer term. The Court is well aware of the COVID-19 pandemic's outsized impact on the prison system and the absolutely appalling conditions that resulted. Mr. Mun was

there for the brunt of it and was himself held under extreme lockdown for months. As Department of Corrections personnel and inmates fell ill or tested positive, and as the lockdown lengthened, the usual functions and routines that served to ameliorate prison life to some extent – including personal visits, phone calls, exercise, hot food, showers and hygiene, religious services, and programs – stopped or broke down.

The Court is equally well aware of the Marshals Service's October 2021 surprise inspection of the D.C. facilities which found "systemic" mistreatment of detainees, including the punitive denial of food and water and unsanitary living conditions, and the emergency removal of hundreds of individuals from the CDF. *See, e.g.*, https://www.washingtonpost.com/dc-md-va/2021/11/05/dc-jail-conditions-transfers; https://dcist.com/story/21/11/03/400-dc-jail-residents-will-be-moved-to-pennsylvania

All this means is that, for much of the past two years, Mr. Mun has been effectively confined to his cell, deprived of human contact and subject to worsening and inhumane conditions, all the while constantly afraid that he would die away from his family and friends, either by being infected with the coronavirus or by falling prey to the increasing violence and chaos at the facility. Irrespective of blame, it cannot reasonably be disputed that Mr. Mun's time in prison has been far more punitive than the equivalent time in more usual circumstances.

The Court should impose a sentence of time served given the conditions Mr. Mun has lived through while in lengthy pretrial confinement. *See, e.g., United States v. Carty*, 264 F.3d 191 (2d Cir. 1991) (recognizing that the conditions of confinement are relevant to the Court's sentencing determination); *United States v. D.W.*, 198 F. Supp. 3d 18, 23 (E.D.N.Y. 2016) ("trial judge cannot close his or her eyes to the conditions a particular defendant being sentenced will

necessarily experience in prison. … the prison environment must be considered by

the sentencing judge in estimating total harm and benefits to prisoner and society—a utilitarian

as well as a compassionate exercise"); *United States v. Majaaliwa*, 2017 U.S. Dist. LEXIS

168305, *1-2 (E.D.N.Y. Oct. 6, 2017) ("'objectively more severe prison conditions' provide a

basis to depart from the [sentencing guidelines] range"). Of course, that he was far from the

support of his family, that he spoke an entirely different language and came from an entirely

different culture has only made his detention more akin to solitary confinement. His mental and

physical health have suffered. That he twice had COVID, and had no one here to care about him,

made his detention not just difficult but also scary.

At the completion of any sentence, he will remain in immigration custody for some

indeterminate time. The amount of time spent in immigration is likely to be longer than normal

bureaucratic necessity as Mr. Mun was paroled into this country with no travel papers and the

United States has no relations with North Korea to obtain necessary paperwork authorizing his

passage out of the United States.

**(3)     The History and Characteristics of the Defendant.**

Mr. Mun is a 57 year old North Korean National. His extended family resides in North

Korea and his wife is presently residing in the embassy in China after leaving Malaysia upon his

extradition to the United States. He was raised by his parents in North Korea under difficult

circumstances. He is married and his wife is presently living in China. She is in need of medical

treatment for recurrent cancer but is awaiting his return to obtain further treatment. She was

initially diagnosed with breast cancer in 2009 and underwent surgery in 2010. She has since had

surgery for ovarian cancer and uterine cancer. She is now at great risk of bone cancer. Until his

arrest in this case, he was her primary caregiver. He has been unable to communicate with her in any meaningful way since his parole into the United States nearly two years ago. The same holds true for their two children. One of them resides with her mother in China while the other remains in North Korea with her family.

Mr. Mun was arrested in Malaysia in May 2019, and while incarcerated there, suffered a stroke. After nearly two years of incarceration in Malaysia under difficult conditions, he was paroled into the United States where he has been held for an additional near two years. The United States custody has been extremely difficult because of the distance from any family or friends or even anyone who speaks his language. Because the United States has no relationship with North Korea, he cannot even get consular visits or support from embassy personnel as most foreign prisoners are able to do. He is a man with little support outside his legal team.

Mr. Mun has never before been convicted of a criminal offense. He is now 57 years old, significantly older than the average defendant. His age and lack of a prior record support a variance.   The United States Sentencing Commission has identified increased age as a powerful predictor of reduced recidivism. U.S.S.C., *A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score* (Jan. 4, 2005), at 13-15, *available at* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2005/20050104_Recidivism_Salient_Factor_Computation.pdf. The Sentencing Commission has reported that "[r]ecidivism rates decline relatively consistently as age increase." U.S.S.C., *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* (May 2004), at 12 & Ex. 9, *available at*

http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/

2004/200405_Recidivism_Criminal_History.pdf.

      Sentences imposed on older offenders also have harsher effects, supporting a finding that

a lesser sentence can achieve the goals of sentencing. Any sentence is a greater proportion of an

older offender's remaining life. *See* Hannah T.S. Long, *The "Inequality" of Incarceration*, 31

Colum. J. L. & Soc. Probs. 321, 343-44 (1998) (suggesting that prison sentences be adjusted for

life expectancy due to age and illness). Older offenders who commit their first crime after the

age of 50 "have problems adjusting to prison since they are new to the environment, which will

cause underlying stress and probable stress-related health problems," and are "easy prey" for

more experienced inmates. *See* U.S. Dep't of Justice, National Institute of Corrections,

*Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill*

*Inmates*, at 10 (2004), *available at* http://www.nicic.org/pubs/2004/018735.pdf.   Older

offenders also are more likely to have medical issues and suffer from mental health problems,

and therefore, they are more likely to suffer greater punishment than the average inmate. *See*

Laura Maruschak, *Medical Problems of Prisoners*, Bureau of Justice Statistics, Tables 1, 2, 4

(Apr. 2008), *available at* http://bjs.ojp.usdoj.gov/content/pub/pdf/mpp.pdf; Katie Gray,

*America's Aging—and Mentally At-Risk—Prisoners*, The Crime Report (Nov. 7, 2016),

*available at* http://thecrimereport.org/2016/11/07/americas-aging-and-at-risk-prisoners/#.

      The Court should also consider that aging inmates also are more costly to incarceration.

*See* U.S. Dept. Office of the Inspector General, The Impact of an Aging Inmate Population on

the Federal Bureau of Prisons at i (May 2015, revised February 2016) ("aging inmates," defined

as inmates 50 years old or older, more costly to incarcerate due to increased medical needs),

*available at* https://oig.justice.gov/reports/2015/e1505.pdf.

A number of courts have found that advanced age supports a below guidelines sentence. *See, e.g., United States v. White*, 506 F.3d 635, 647 (8th Cir. 2007) (upholding downward variance for 51-year-old defendant, based in part on age); *United States v. Martinez,* Crim. No. 99-40072, 2007 WL 593629, at *2 (D. Kan. Feb. 21, 2007) (notifying counsel that non-guideline sentence being considered based, in part, on defendant's age, referencing recidivism reports showing increased age and first offender status show decreased likelihood of recidivism); *United States v. Ruiz*, Crim. No. 04-1146-03, 2006 WL 1311982, at *4 (S.D.N.Y. May 10, 2006) (noting several courts have imposed non-guideline sentences for defendants over 40 based on markedly reduced recidivism, citing recidivism study); *United States v. Cannaday*, No. 08-172, 2009 WL 1587183, at *3 (E.D. Wis. June 5, 2009) (imposing reduced sentence for 46-year-old defendant, citing the Commission's report showing that "recidivism tends to decline among those around defendant's age"); *see also United States v. Chase*, 560 F.3d 828, 831 (8th Cir. 2009) (vacating sentence because district court erroneously concluded age, among other factors, could not support downward variance); *cf.* U.S.S.G. § 5H1.1 (age, "individually or in combination with other offender characteristics," may be basis for departure).

**(4)      The Purposes of Sentencing.**

The Sentencing Reform Act requires the Court to impose a sentence that not only will reflect the seriousness of the offense and promote respect for the law, but also will provide just punishment, afford deterrence to criminal conduct, and protect the public from further crimes of the defendant. Here, the Court can fully achieve these sentencing goals without imposing an

14

additional term of incarceration, and additional incarceration would be unnecessarily harsh due to Mr. Mun's age, family circumstances and the circumstances of the offense.

**(5)    The Need to Avoid Unwarranted Disparities.**

Not all disparities in sentencing are prohibited – only *unwarranted* disparities. *See* 18 U.S.C. § 3553(a)(6).   Here, a consideration of the § 3553 factors demonstrates that in this case, a sentence below the range is appropriate. The circumstances of other cases in which "national security" was involved and a sentence within the range was imposed, do not compare to the circumstances of the instant offense. *See*, *e.g.*, *Vasquez*, 745 Fed. Appx. at 322-23 (defendant who entered guilty plea to participating in weapons smuggling scheme sentenced to 46 months); *Kuyumcu*, No. 16-cr-308 (DLI), 2017 WL 3995576 (defendant who shipped Colbalt Powder with potential military and nuclear applications to Iran and continued to attempt to do business with Iran sentenced to 57 months); *McKeeve*, 131 F.3d at 14-15 (defendant who violated expert controls by selling computer equipment to Libya and obstructed justice by committing perjury when testifying at his trial sentenced to 51 months).

No *unwarranted* disparity would result from such a variance as sentences below the applicable range are common in cases applying § 2M5.1. *See United States v. Groos*, 2008 WL 5387852 (N.D. Ill. 2008) (corporate executive who sent sprinkler equipment to Iranian company in violation of IEEPA sentenced to two months); *United States v. Sevilla*, No. 04 CR 171, 2006 WL 3486872 (N.D. Ill. Nov. 29, 2006) (defendant who attempted to evade export controls by sending a hydraulic floor model testing machine to Iran sentenced to five years probation).   The Court in *Gross* noted that "courts generally do not impose harsh punishment on embargo crimes that involve non-military goods." *Gross*, 2008 WL 5387852 *8. The *Gross* court referenced

numerous similar cases. *Id.* at n.10 (citing *United States v. Angehr,* No. 08 CR 0003 (E.D. La., filed Jan. 4, 2008) (sentenced for violation of the IEEPA for exports of computer software to Iran to five years probation, four to six months confinement to a halfway house, and a $250,000 fine plus forfeiture); *United States v. Freyer,* No. 06 CR 891 (C.D. Cal., filed Dec. 1, 2006) (sentenced for violations of the IEEPA for exporting petrochemical valves to Iran and Iraq via Australia to three years probation, six months of home detention, 240 hours of community service, and a $5,000 fine plus costs for the co-defendant who pled guilty and to seventeen months of imprisonment and two years of supervised release for the co-defendant did *not* plead guilty); *United States v. Ghashim,* No. 06 CR 283 (S.D. Tex., filed Aug. 14, 2006) (sentenced for violations of the IEEPA for exports of computers to Syria via the UAE to three years probation); *United States v. Khan,* No. 04 CR 441 (E.D.N.Y., filed May 5, 2004) (sentenced for violations of the IEEPA for exports of aircraft parts to Iran to five years probation, 300 hours of community service, $100,000 fine plus forfeiture); *United States v. Rezaei,* No. 07 CR 380 (N.D. Ga., filed Nov. 14, 2007) (sentenced for violations of the IEEPA for exporting computers to Iran to an unspecified amount of time served, three years of supervised release and forfeiture); *United States v. Mahmood,* No. 04 CR 365 (D.D.C., filed Aug. 10, 2004) (sentenced for violations of the EAR for exporting lift truck parts to Iran via the UAE to time served, seventeen months, and two years supervised release)). In *United States v. Hanna*, *661 F.3d 271, 293-94 (6th Cir. 2011) the court found that the six-level enhancement applied simply because the defendant knew that the materials, even if they were deemed innocuous, were headed to an embargoed country. In Hanna, the defendant went to trial and was convicted of laundering money in excess of 9.5 million. The

16

government sought a sentence using the money laundering guidelines of nearly 20 years. The Court found the guideline range to be 188 to 235 months but sentenced Ms. Hanna to 72 months.

A sentence of time served (nearly 4 years) would exceed sentences imposed upon individuals who have entered guilty pleas to acting as agents of foreign governments. *See United States v. Kun Shan Chun*, 16-cr-518 (VM) (S.D.N.Y.); *United States v. Ghazi Al-Awadi*, 07-cr-20314 (DT) (E.D. Mich.). Mr. Chun was an FBI technician with top secret security clearance who provided sensitive, although unclassified, information to Chinese officials over the course of multiple years, causing significant harm to U.S. national security interest. *Chun*, 16-cr-518 (VM) (S.D.N.Y.), ECF No. 13 (Gov't Sent. Memo.) (Jan. 6, 2017) (noting defendant attempted to cooperate but was found not credible). He was sentenced to 24 months. Mr. Al-Awadi had a prior criminal record (include a manslaughter conviction) placing him in criminal history category III, but he was sentenced to just 18 months. The government requested a 51-month sentence because over the course of at least five years, he supplied Saddam Hussein's Iraqi regime with information regarding Iraqi expatriates in the United States. *Al-Awadi*, 07-cr-20314 (DT) (E.D. Mich.), ECF No. 20 (Gov't Sent. Memo.) (Dec. 7, 2007). Mr. Mun's conduct did not rise to the level of risk to national security as did that of Mr. Al-Awadi.

The Bureau of Industry and Security within the Department of Commerce administers and enforces controls on the export of items with primarily commercial uses that can also be used in ways that affect national security. They track and report annually to Congress enforcement efforts to stop the export of sensitive commodities. A review of those dispositions provides further support for a sentence of time-served in this case.

https://www.bis.doc.gov/index.php/about-bis/newsroom/archives/annual-reports. See Exh. 1.

Given the comparisons, imposing a sentence of time served here would not constitute an unwarranted disparity and would promote respect for the law.

### Conclusion

For all of the foregoing reasons and such other reasons as may be presented at the sentencing hearing, Mr. Mun respectfully moves this Honorable Court to vary from the applicable Guidelines sentencing range and impose a sentence of time served.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/

_____

Michelle Peterson
Chief Assistant Federal Public Defender
625 Indiana Avenue, N.W.
Suite 550
Washington, D.C.   20004
(202) 208-7500 ext. 109

        &   Sabrina Shroff, Esq.
80 Broad Street, 19th Floor
New York, New York 10004

Counsel to Mun Chol Myong

18