**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | : |
| | : |
| | : |
| **v.** | : **Crim. No. 19-cr-147-RC** |
| | : |
| **MUN CHOL MYONG,** | : **Sentencing Hearing: January 20, 2023** |
| | : |
| **Defendant.** | : |
| | : |

<u>**UNITED STATES' MEMORANDUM IN AID OF SENTENCING**</u>

The United States of America, by and through undersigned counsel, respectfully submits this Memorandum in Aid of Sentencing. Mun Chol Myong ("Mun" or "the Defendant") was acting as an agent of Democratic People's Republic of Korea ("DPRK" or "North Korea") and sought to assist the DPRK government when he committed his money laundering offenses. For the reasons stated herein, the United States recommends that the Court sentence the Defendant to a significant period of incarceration after consultation with the U.S. Sentencing Guidelines ("Sentencing Guidelines" or "U.S.S.G.").[1]

## I.    INTRODUCTION

On May 2, 2019, a federal grand jury returned an indictment against the Defendant, charging him with one count of money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count 1), and four counts of international promotion money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A) (Counts 2-4, 6). *See* Indictment (ECF No. 7-1). On May 14, 2019, Malaysian authorities arrested the Defendant pursuant to an extradition request from the United

---

[1] The government is also filing a Supplement to this Memorandum under seal and pursuant to pursuant Standing Order No. 21-3 (BAH) (Jan. 12, 2021) to provide the Court with additional information related to the DPRK and other issues.

States.  The Defendant physically resisted his arrest in Malaysia and was alleged to have physically resisted/assaulted the Malaysian law enforcement who detained him.  A Malaysian court ordered the Defendant held without bond pending his removal to the United States.  Mun subsequently contested his extradition through several levels of the Malaysian judiciary.  On March 9, 2021, Malaysia's Federal Court denied Mun's final appeal and ordered his extradition to the United States.

This Court held an initial appearance on March 22, 2021.  S*ee* Minute Entry (Mar 22, 2021).  The United States moved for pretrial detention, *see* Motion for Pretrial Detention (ECF 11), and the Defendant moved to indefinitely continue the detention hearing and agreed to remain detained, *see* Motion to Continue Detention Hearing to a Date to be Determined (ECF 12).  The Defendant has been continuously detained since May 14, 2019.  Since his extradition, until his guilty plea, the Defendant has agreed to a tolling of time under the Speedy Trial Act, and this Court has agreed to the same.  The need for tolling arose from the complexity of the case, including that this matter might involve the handling of classified information and/or classified discovery.

On May 13, 2021, the Defendant was arraigned and pled not guilty to all counts.  *See* Minute Entry (May 13, 2021).  On August 1, 2022, the Defendant moved to withdraw his plea of not guilty and instead sought to enter an *Alford* plea.  *See* Motion for the Court to Accept an Alford Plea (ECF No. 34).  The Court subsequently granted the Defendant's motion over the Government's objection, *see* Order Granting Defendant's Motion to Proceed by *Alford* Plea (ECF 35), and accepted his guilty plea to all counts on September 6, 2022, *see* Minute Entry (Sep. 6, 2022).  The Defendant pled guilty to one count of money laundering conspiracy, in violation of 18 U.S.C. § 1956(h), and four counts of international promotion money laundering,

in violation of 18 U.S.C. § 1956(a)(2)(A).  Because the Defendant did not accept a formal statement of facts under oath pursuant to his plea, the United States filed a proffer of offense conduct prior to the Defendant's plea, which outlined the relevant conduct in this case.  *See* Notice of Filing of Proffer of Offense Conduct (ECF No. 36).  The Defendant has not contested any facts from this proffer.  Because the Defendant did not agree to a plea agreement, he remains free to appeal multiple aspects of this case, including any sentence.  He also did not agree to enter into a stipulated order of removal from the United States, which is a common condition of many plea offers from the United States involving non-U.S. persons.[2]

## II.    FACTUAL SUMMARY

The charges in this case arose from a scheme to deceive U.S. financial institutions into processing correspondent banking transactions for the DPRK.  Because the DPRK remains an international pariah state, many of its financial entities have been subject to United Nations and U.S. sanctions.  Such sanctions make it difficult for designated countries to use the international banking system to their benefit, as many international transactions require the use of U.S. dollars and U.S. banks.  The Defendant, who was affiliated with the DPRK government, engaged in the conspiracy to benefit the DPRK, which is more specifically laid out in the proffer of offense conduct.  *See* Notice of Filing of Proffer of Offense Conduct (ECF No. 36). That proffer includes, but is not limited to, the following facts and circumstances.

Between 2013 and 2018, Mun conspired with others to launder monetary instruments through the U.S. financial system.  Mun and his co-conspirators purchased goods destined for North Korea and engaged in other financial transactions benefitting the DPRK government in

---

[2] Since the plea has been signed, defense counsel has advised that the Defendant may – on his own volition and without any promises from the United States – seek to waive his right of appeal and/or agree to a stipulated order of removal in order to gain a benefit at sentencing.

violation of sanctions imposed by the United States and the United Nations.  To successfully execute U.S. dollar transactions, Mun and his co-conspirators took steps to defeat the transaction monitoring systems and anti-money laundering controls implemented by U.S. correspondent banks that would have otherwise denied these transactions.  Mun and his co-conspirators engaged in a scheme to defraud U.S. correspondent banks by using front companies, third-party payments, and falsified transaction documents, among other means, to deceive U.S. banks into processing the illicit transactions.  The co-conspirators' falsification of transaction documents included stripping out all references to sanctioned entities and the DPRK.

To execute their scheme, Mun and his co-conspirators expressly discussed the need to deceive U.S. banks to avoid having the transactions rejected.  For example, on or around October 8, 2015, Co-Conspirator 1 wrote to Mun: "Kindly note that SINSMS PTE LTD will be changing the BANKING BANK for all USD and SGD Business Transaction wef [sic] from 14th OCT 2015 from [Singapore Bank 1] to [Singapore Bank 2].  I would highlight that during Transaction please do not indicate in your Bank transaction form using the name of Nampo Port, DPR Korea and North Korea.  This is sensitive to the bank and the transaction will automatice (sic) reject and will go to Central Fund of USA."  Mun responded: "Kindly pls send me Bank Name."

As part of the conspiracy, between in or about April 2013 and in or about November 2018, Mun and his co-conspirators engaged in business transactions that involved the execution of dozens of financial transactions through numerous international banks.  In the process, Mun and his conspirators laundered more than $1.2 million through the U.S. financial system on behalf of sanctioned North Korean entities.  The transactions at issue concerned the purchase and sale of controlled U.S.-origin technology, agricultural commodities, and prohibited luxury goods like liquor and tobacco, for North Korean customers.  In so doing, Mun profited himself, and

permitted sanctioned DPRK entities to continue their business, and in turn, their financial viability.  The sanctioned entities at issue here include: (1) the Reconnaissance General Bureau ("RGB"), which is North Korea's primary intelligence organization which has been involved in conventional arms trade proscribed by numerous United Nations Security Council Resolutions, and was responsible for collecting strategic, operational, and tactical intelligence for the Ministry of the People's Armed Forces in North Korea, (2) the Korea Daesong Bank, which handles foreign currency accounts of Office 39 of the Korean Workers' Party, which in turn provides critical support to North Korean leadership by facilitating illicit economic activities and managing slush funds and generating revenues for the leadership; and (3) the North Korean Foreign Trade Bank ("FTB"), which the DPRK government uses to facilitate transactions with persons who are linked to its ballistic missile proliferation network.

## III.    SENTENCING STANDARD

In determining the sentence to be imposed, the court shall consider the factors set forth in 18 U.S.C. § 3553(a).  *See* 18 U.S.C. § 3553.  The court shall first consider the applicable Sentencing Guidelines range – as identified in 18 U.S.C. § 3553(a)(4)(A) – and then weigh all the factors set forth in 18 U.S.C. § 3553(a).  *See, e.g.*, *Gall v. United States*, 552 U.S. 38, 49-50 (2007).

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court ruled that the Sentencing Guidelines are no longer mandatory.  The Supreme Court subsequently explained that "the Sentencing Guidelines should be the starting point and the initial benchmark," *Gall*, 552 U.S. at 49, but they "now serve as one factor among several courts must consider in determining an appropriate sentence," *Kimbrough v. United States*, 552 U.S. 85, 92 (2007).

A district court "must make an individualized assessment based on the facts presented."

*Gall*, 552 U.S. at 50.  If the district court determines "that an outside-Guidelines sentence is warranted, [the court] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.*

## IV.    SENTENCING ANALYSIS

### A.    Statutory Penalties

The penalties for money laundering conspiracy, in violation of 18 U.S.C. § 1956(h), include a maximum term of imprisonment of 20 years and a maximum fine of $500,000 or twice the value of the monetary instruments or funds involved in the transportation, transmission, or transfer, whichever is greater.  *See* 18 U.S.C. §§ 1956(h); 1956(a)(2).  The same maximum penalties apply to each count of substantive money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A).  The Court can impose a period of not more than three years' supervised release, but may choose not to impose such period in the case of deportable alien, such as Mun.  *See* 18 U.S.C. §§ 3583(b)(2); 3559(a)(3).

### B.    United States Sentencing Guidelines Calculation

The United States submits that the Presentence Investigation Report ("PSR") properly applies the Sentencing Guidelines to arrive at a total offense level of 32 resulting in a recommended term of incarceration of 121 to 151 months.  *See* Presentence Investigation Report (ECF No. 39) ¶ 114.  Because Count One of the Indictment charges international promotion money laundering (where the underlying offense level for the laundered funds cannot be determined), U.S.S.G. § 2S1.1(a)(2) applies and the base offense level is 22,[3] which consists of 8

---

[3]Count One of the Indictment charges both conspiracy to commit international promotion money laundering and international concealment money laundering, in violation of 18 U.S.C. § 1956(a)(2)(B), that is to conceal or disguise proceeds of financial institution fraud, a violation of 18 U.S.C. § 1344, *see* Indictment (ECF No. 7-1) ¶ 30-1.  It may also be possible to calculate the offense level for the underlying bank fraud offense for the concealment money laundering part

plus the number of offense levels from the table in U.S.S.G. § 2B1.1 corresponding with the value of the laundered funds, which in this case is in excess of $1.2 million, resulting in a level 14.[4]  The United States agrees with the Probation Office that the Defendant knew or believed that the laundered funds were the proceeds of, or were intended to promote, an offense involving national security, and thus a six-point enhancement is warranted under U.S.S.G. § 2S1.1(b)(1)(B)(iii).  *See, e.g., United States v. Hanna*, 661 F.3d 271, 289 (6th Cir. 2011). The United States agrees that a two-point enhancement applies because the Defendant was convicted under 18 U.S.C. § 1956.  *See* U.S.S.G. § 2S1.1(b)(2)(B).  The United States additionally agrees that a two-point enhancement applies because the Defendant engaged in sophisticated laundering.  *See* U.S.S.G. § 2S1.1(b)(3).  Based upon a total offense level of 32 and a criminal history category of I, the Sentencing Guidelines range for Mun is 121 to 151 months of imprisonment.  *See* U.S.S.G. Chapter 5, Part A.

With respect to the fine, the United States agrees with the Probation Office that U.S.S.G. § 5E1.2(c)(4) would raise the high end of the fine range to the maximum amount specified in the relevant statute.  *See* U.S.S.G. § 5E1.2(c)(4).  However, the maximum fine specified in 18 U.S.C. § 1956(a)(2) is "not more than $500,000 *or twice the value of the monetary instrument or funds involved in the transportation, transmission, or transfer, whichever is greater*."  18 U.S.C. § 1956(a)(2) (emphasis added).  Application Note 5 to U.S.S.G. § 5E1.2 identifies 18 U.S.C. § 1956(a) as a statute to which U.S.S.G. § 5E1.2(c)(4) applies and notes that 18 U.S.C. § 1956(a)

---

(but not the promotional money laundering), which would implicate U.S.S.G. § 2S1.1(a)(1). Doing so would technically result in a base offense level 22 for the promotion and level of 21 for the concealment.

[4]    Because the Defendant is charged, in part, with conspiracy to engage in international promotion money laundering, a violation of 18 U.S.C. § 1956(a)(2)(A), *see* Indictment (ECF No. 7-1) ¶ 30, and four substantive counts of international promotion money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A), *see id.* ¶¶ 34-35, the laundered funds may not be derived from an underlying offense and U.S.S.G. § 2S1.1(a)(1) would not apply.

"authorizes a fine equal to the greater of $500,000 or two times the value of the monetary instruments or funds involved in offenses involving money laundering of financial instruments." Here, the United States has alleged that "the Defendant and his co-conspirators sent more than $1.2 million in wire transfers through correspondent bank accounts at U.S. financial institutions on behalf of North Korean entities that were otherwise barred from the U.S. financial system." Proffer of Offense Conduct (ECF No. 36-1) at 3. Accordingly, the applicable fine range should be $35,000 to $2.4 million.[5]

The government also agrees with the PSR that, in most cases involving an *Alford* plea, the Defendant should not receive a reduction for acceptance of responsibility under U.S.S.G. § 3E1.1. *See* U.S.S.G. §3 E1.1, Application Note 1 (laying out multiple factors, including first factor "truthfully admitting the conduct compromising the offenses of conviction and truthfully admitting . . . any additional relevant conduct). This is consistent with prior Court practice, as no acceptance of responsibility points were given in *United States v. Cowser*, 7-cr-83 (J. Robertson), where the defendant there pled guilty to the indictment in an *Alford* plea. As noted in footnote 1, the government is aware that the Defendant has indicated a desire to waive his right to appeal and enter into a stipulated order of removal without any promises from the United States. Should this occur, the government anticipates that it will continue to object to giving acceptance of responsibility under U.S.S.G. § 3E1.1. However, the government does acknowledge that such action in this case – where the Defendant pled guilty to all charges and might be retaliated against upon his return to the DPRK -- might justify this Court in giving the Defendant a downward variance from the Guideline.

The government acknowledges that the Court can make a downward departure of up to

---

[5] The government did not realize the PSR contained this error at the time of its review of the draft PSR, and apologies for this oversight.

six months based on the Defendant's status as a removable alien, pursuant to *United States v. Smith,* 27 F.3d 649 (194), and U.S.S.G. § 5K2.0(a)(2)(B).[6]  PSR at ¶¶ 139-140.  The Defendant has not submitted a stipulated order of removal, which is of import because the Defendant does not have a current passport from the DPRK, and the United States has no formal international relationship with the DPRK.  The Defendant is likely to be deported to the DPRK after his sentence is complete.

### C.      Statutory Sentencing Factors of 18 U.S.C. § 3553(a)

The factors articulated in 18 U.S.C. § 3553(a) demonstrate that the imposition of a significant period of incarceration would be appropriate in this case.  In weighing the Section 3553(a) factors, the district court should consider not only the nature and circumstances of the offense and the history and characteristics of the defendant, but also the applicable sentencing objectives – that is, that the sentence: (1) reflects the seriousness of the offense; (2) promotes respect for the law; (3) provides just punishment; (4) affords adequate deterrence; (5) protects the public; and (6) effectively provides the defendant with needed educational or vocational training and medical care.  *See* 18 U.S.C. § 3553(a)(1) and (2).  In addition, the sentence should reflect "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).

### 1.      The Nature and Circumstances of the Offenses

The Defendant deliberately acted to assist the DPRK, and he committed a serious federal offense by conspiring to deceive U.S. banking institutions and launder funds – in excess of $1.2

---

[6] The government recognizes that in some cases the basis for the *Smith* departure may not exist because that departure is predicated on a societal interest to transfer offenders back into the community to help maximize successful reintegration into society, but that underlying policy goal is not present with alien defendants who are subject to deportation immediately after serving a federal sentence.

million – for the benefit of the DPRK.  By executing wire transfers, Mun and his co-conspirators used the U.S. financial system to obtain commodities and funds for North Korea, knowing that U.S. banks, in accordance with their own rules and regulations, would otherwise reject those payments if they became aware that the transactions were linked to North Korea.  In so doing, Mun and his co-conspirators committed numerous frauds against several U.S. banking institutions by submitting fraudulent information, documents, and certifications on numerous occasions to these institutions.  This scheme to defraud involved the use of multiple front companies, fraudulent invoices, shipments and wires through several different countries and involved conspirators from other countries.  This complex endeavor benefited the DPRK government, and the Defendant in particular.

During the conspiracy, the DPRK and certain individuals and entities affiliated with the DPRK were subject to extensive sanctions by the United States and the United Nations arising from the DPRK's proliferation of ballistic missile technology and its pursuit of nuclear weapons. *See, e.g.,* Proffer of Offense Conduct (ECF No. 36-1) ¶¶ 2-4, 9-11, 16, 18, 22, 24, 26. Additionally, on November 9, 2016, FinCEN issued a final rule prohibiting U.S. financial institutions from maintaining correspondent accounts for North Korean financial institutions or processing transactions involving North Korean financial institutions.  *Id.* ¶ 8.  FinCEN further required U.S. financial institutions to engage in enhanced due diligence to root out any transactions by North Korean financial institutions and entities acting on their behalf.  *Id.*  U.S. financial institutions that failed to comply with the special measure could have been subject to civil and criminal penalties.  *Id.*  It is for this reason that the Defendant is subject to an additional six level enhancement under U.S.S.G. § 2S1.1(b)(1)(B)(iii).  The government  acknowledges that, while the Defendant's conduct did impact national security, the items at issue were mostly

non-dual use material that themselves could not be used for WMD or ballistic missile proliferation.  For example, many of the financial transactions at issue here were for luxury items (beer, whisky, cigarettes), palm tree sugar, and other agriculture products.  While the government believes the six-level enhancement still applies under the Guidelines because of the severity of the sanctions at issue, it concedes that the Court could provide a variance to the Defendant under the unique circumstances of this case.

To assist the DPRK in avoiding international sanctions, Mun and his co-conspirators engaged in a complex, international fraud scheme for multiple years.  This conduct was intentional, and the Defendant knew what he was doing was clearly wrong.  This case marks the first successful arrest, extradition, prosecution, and conviction of a DPRK national in the United States due to conduct related to money laundering based upon fraud against U.S. banks who were attempting to comply with the U.S. sanctions against the DPRK.  For decades the DPRK government has consistently ignored, flaunted, and avoided international sanctions, and distributed propaganda to its own people telling them to ignore or bypass sanctions as a right. While the DPRK may have made the Defendant believe he would never be caught or held accountable, this prosecution proves otherwise.  Under these circumstances, a just punishment requires a significant measure of incarceration.

2.    The History and Characteristics of the Offender

Mun is a North Korean citizen who received a university degree from the Foreign Language University in Pyongyang, North Korea.  He has been married for over 32 years and has two children.  Mun speaks English and was involved in business in China, Singapore, and Malaysia for several years prior to his arrest.  He was also affiliated with the RGB, a sanctioned entity.  Mun is presently unemployed and has no known prior criminal convictions or arrests.  He

also has no assets within the United States.

In or around 2017, Mun was stationed in Singapore working for one of the front companies identified in the Indictment.  In or about September 2017, Mun was expelled by Singapore for violating sanctions imposed by United Nations Security Council Resolution 2321, which condemned North Korea's September 2016 missile tests.  Mun then moved to Malaysia. Despite his expulsion, Mun continued his illegal activities in Malaysia.  While contesting his extradition to the United States, Mun was incarcerated in Malaysia from May 14, 2019 to March 19, 2021, mostly during the height of the COVID pandemic.  The United States concedes that Mun should receive credit for time served in Malaysia in this case.

As a North Korean citizen, Mun will be immediately subject to removal from the United States upon completion of any term of imprisonment imposed by this Court.  The United States is also aware that the DPRK government is notoriously unpredictable in so far as they often punish or imprison their own citizens for unknown reasons.  The government acknowledges that the DPRK government may seek to retaliate against the Defendant or his family if they believe he has insulted the regime, cooperated with foreign authorities, or otherwise become a source of embarrassment for the country.  For example, the government is aware that the DPRK government cut off diplomatic relations with Malaysia as a result of the defendant's extradition to the United States.

3.   <u>The Need to Promote Respect for the Law, to Provide Just Punishment, to Afford Adequate Deterrence, and to Protect the Public</u>

While many who may commit crimes against the United States abroad believe that they will never the caught or captured, this case proves otherwise.  The Defendant's conduct is serious, and a significant sentence of incarceration is merited.  Such a sentence would promote respect for U.S. law (that applies extraterritorially), to provide for specific and general deterrence

and to protect the public to afford proper deterrence against such foreign criminals who would conspire to violate U.S. law, deceive U.S. financial institutions, and undermine international sanctions.

The government agrees that it is unlikely that the Defendant will violate U.S. law again once he is released, but the need for general deterrence still exists.

4. <u>The Need for Educational Service, Vocational Training, or Medical Care</u>

The Defendant does not appear to be in need of educational, vocational services or medical care. The government notes that members of the Defendant's family do suffer from significant medical conditions.

5. <u>The Need to Avoid Unwarranted Sentencing Disparities</u>

The starting point in the Court's analysis under § 3553(a)(6) should be to consider the sentences of "defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The United States acknowledges that sentences in money laundering cases may vary greatly, and that underlying the Defendant's conduct is his harm to the national security of the United States by violating U.S. law for the purpose of undermining the U.S. sanctions regime against the DPRK. Some cases that involve similar equities to the case at bar are listed below. However, none of these cases involve application of the 6-level enhancement under U.S.S.G. § 2S1.1(b)(1)(B)(iii), and in most cases the defendants received 3 level reductions under U.S.S.G. § 3E1.1. These include:

- *Cho Yan Nathan Man*, 19-cr-218 (J. Huvelle) (violation of 22 U.S.C. § 2278, unlawful exports) -- sentenced to time-served of around 11 months of imprisonment, no term of supervised release.

- *Beng Sun Koh*, 19-cr-002 (J. Contreras) (violation of 18 U.S.C. § 371, conspiracy

to defraud the United States and Violate the International Emergency Economic Powers Act, 50 U.S.C. §1705 (IEEPA) -- sentenced to 18 months of imprisonment, 12 months of supervised release.

- *Majid Ghorbani*, 18-cr-255 (J. Friedman) (violation of 50 U.S.C. § 1705, IEEPA and ITR) -- sentenced to 30 months of imprisonment, 36 months of supervised release (later reduced to time-served in response to motion for compassionate release in early days of the global pandemic).

- *Apichart Srivaranon*, 17-cr-167 (J. Walton) (violation of 18 U.S.C. § 371, conspiracy to defraud the United States) -- sentenced to 26 months of imprisonment, no term of supervised release.

- *Arzu Sagsoz*, 16-cr-179 (J. Walton) (violation of 18 U.S.C. § 371, conspiracy to defraud the United States and to violate IEEPA) -- sentenced to 20 months of imprisonment, one year of supervised release.

- *Arash Sepehri*, 16-cr-081 (J. Collyer) (violation of 18 U.S.C. § 371, conspiracy to defraud the United States and to violate IEEPA) -- sentenced to 25 months of imprisonment, no term of supervised release.

- *Justin Gage Jangraw*, 14-cr-174 (J. Boasberg) (violation of 22 U.S.C. § 2778, unlawful export of defense articles) -- sentenced to 8 months of imprisonment, 12 months of supervised release.

- *Preerayuth Burden*, 14-cr-069 (J. Collyer) (violations of 18 U.S.C. § 371 and 22 U.S.C. § 2778, International Traffic in Arms Regulations) -- sentenced to 55 months of imprisonment, 36 months of supervised release (found guilty after trial, conviction vacated on appeal, after which parties entered deferred prosecution

agreement with cooperation requirement).

- *Kitibordee Yindeear-Rom*, 14-cr-069 (J. Collyer) (violation of 18 U.S.C. § 371, conspiracy to defraud the United States and to violate the AECA and the ITAR) -- sentenced to 36 months of imprisonment and three years of supervised release pursuant to Rule 11(c)(1)(C) plea agreement (sentence later reduced to time served for substantial assistance under Federal Rule of Criminal Procedure 35(b)).

- *Christopher M. Gray*, 13-cr-107 (J. Kollar-Kotelly) (violation of 22 U.S.C. § 2778, unlawful export of defense articles) -- sentenced to 36 months of imprisonment, 24 months of supervised release.

- *David Levick*, 12-cr-52 (J. Boasberg) (violation of 50 U.S.C. § 1705, unlawful exports to embargoed country) – sentenced to 24 months of imprisonment, one year of supervised release.

- *Arsalan Shemirani*, 12-cr-75 (J. Leon) (violation of 18 U.S.C. § 371, conspiracy to  defraud the United States and to violate IEEPA) – sentenced to 48 months of imprisonment, 36 months of supervised release (court denied government's request for three-point downward departure for substantial assistance under U.S.S.G. 5K1.1).

- *Hossein Ali Khoshnevisrad*, 09-cr-165 (PLF) (violation of 50 U.S.C. § 1705, conspiracy to export to embargoed country) – sentenced to 15 months of imprisonment, 36 months of supervised release.

## V.    __CONCLUSION__

WHEREFORE, the United States respectfully recommends that this Court sentence Mun to a significant term of imprisonment.  The government further requests that the execute any requested Order of Judicial Removal proffered by the defense.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      /s/ Tejpal S. Chawla
Tejpal S. Chawla
D.C. Bar No. 464012
Assistant United States Attorney
Michael P. Grady
D.C. Bar No. 492947
Special Assistant United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20530
202-252-7280 (Chawla)
202-616-5193 (Grady)
tejpal.chawla@usdoj.gov
michael.grady@usdoj.gov

MATTHEW G. OLSEN
Assistant Attorney General
National Security Division

By:      /s/ David C. Recker
David C. Recker
Trial Attorney
Counterintelligence and Export Control Section
National Security Division
U.S. Department of Justice
202-233-2261
david.recker@usdoj.gov